FILED

2026 Mar-20  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **STEPHEN DYSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:22-cv-01383-MHH** |
| | } | |
| **MATSU ALABAMA, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Stephen Dyson has sued his former employer, automotive parts manufacturer, Matsu Alabama, Inc.  (Doc. 33).  Mr. Dyson alleges that Matsu discriminated and retaliated against him in violation of the Americans with Disabilities Act, interfered with his request for leave pursuant to the Family and Medical Leave Act, and retaliated against him for requesting FMLA leave.  (Doc. 33).  Matsu has filed a summary judgment motion.  (Doc. 24).  Matsu also has moved to strike evidence Mr. Dyson submitted in response to Matsu's motion.  (Doc. 41).  This opinion addresses Matsu's motions.  To resolve Matsu's motions, the Court first states the standard that governs summary judgment motions.  Next, the Court summarizes the relevant summary judgment evidence, viewing the evidence in the light most

1

favorable to Mr. Dyson.  The Court then analyzes this evidence under the appropriate law to evaluate the parties' summary judgment arguments.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").  Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at

2

1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Conclusory statements in a declaration cannot by themselves create a genuine issue of material fact.  *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

## II.

"Matsu Alabama is an automobile parts manufacturer located in Huntsville, Alabama that specializes in producing metal stamped parts and complex welded assemblies."  (Doc. 25-3, p. 2, ¶ 4).  In 2015, when Matsu hired Mr. Dyson as a quality engineer, its Huntsville facility "was supplying parts to Honda North America, KTH, Marelli, Smart, Lear, Magna and other smaller tier one and tier two manufacturers."  (*See* Doc. 25-2, p. 73; Doc. 25-1, p. 20, tpp. 70–71; Doc. 25-3, p. 2, ¶ 4).

At the end of 2015, Matsu transferred Mr. Dyson to its Ohio facility and promoted him to quality manager.  (Doc. 25-1, p. 22, tpp. 78–79, 81).  He held this position for 13 months.  (Doc. 25-1, p. 23, tpp. 82–83).  Although Matsu received some quality complaints from Honda and a few from Chrysler, Matsu did not take

3

disciplinary action against Mr. Dyson while he was working in Ohio. (Doc. 25-1, p. 23, tpp. 84–85).

In December 2017, Matsu transferred Mr. Dyson to Alabama to oversee the Huntsville plant's quality department. (Doc. 25-1, pp. 24, 25, tpp. 86, 90). Between 2017 and 2021, the Huntsville facility experienced financial difficulties, (Doc. 25-3, p. 7), and customers raised concerns about the quality department, (*see, e.g.*, Doc. 25-1, pp. 28, 30, 31, tpp. 105, 112, 114). Despite these issues, Mr. Dyson received "Good" performance reviews from Barry Courtney, the plant's manager, and Matsu did not take any disciplinary action against Mr. Dyson during his time. (Doc. 25-1, p. 30, tpp. 110–11).

Robert Teixeira, Matsu's Director of U.S. Operations, asked Mr. Dyson to develop a succession plan for the quality department, but Mr. Dyson did not complete the plan. (Doc. 25-1, p. 39, tp. 148). Mr. Teixeira also asked Mr. Dyson to track work for Lear, but Mr. Dyson did not do so. (Doc. 25-1, p. 40, tpp. 150–51).

Mr. Dyson recalls a quality issue that originated in the plant's stamping department, an area for which he was not responsible. (Doc. 25-1, p. 40, tp. 151). When a separate issue arose concerning a quality department employee's

qualification for certain work, another Matsu employee told Mr. Dyson that he would raise the issue with Mr. Teixeira. (Doc. 25-1, pp. 39–40, tpp. 149–50).[1]

On August 6, 2021, Mr. Courtney accompanied Mr. Dyson to a meeting with Mr. Teixeira, during which Mr. Teixeira terminated Mr. Dyson. (Doc. 25-1, p. 45, tp. 171). Mr. Teixeira did not give Mr. Dyson a reason for his termination. (Doc. 25-1, p. 45, tp. 172). As Mr. Courtney escorted Mr. Dyson out of the plant, Mr. Courtney told Mr. Dyson that his termination "was a shock," and Mr. Courtney apologized to Mr. Dyson. (Doc. 25-1, p. 45, tp. 173). Mr. Dyson received a termination letter that mentioned "poor performance or discipline," but Matsu Alabama's human resources manager, Debbie Dabbs, told Mr. Dyson that his personnel file showed no disciplinary history. (Doc. 25-1, p. 43, tp. 163). Mr. Dyson testified that Ms. Dabbs said words to the effect of "[i]t was not because of disciplinary action that you were let go." (Doc. 25-1, p. 43, tp. 164).

At the time of his termination, Mr. Dyson had several medical conditions, including type 2 diabetes, high cholesterol, a pituitary tumor, and hypothyroidism. (Doc. 25-1, p. 15, tpp. 52–53). He had undergone two hip replacement surgeries, one in 2019 and another in 2020, and a back surgery, and he had received treatment for a heart condition. (Doc. 25-1, pp. 15, 17, 19, tpp. 51–52, 60–61, 68). Mr. Dyson

---

[1] Mr. Teixeira submitted a declaration describing his perception of more extensive concerns with Mr. Dyson's work. (*See generally* Doc. 25-3).

had scheduled his knee replacement surgery for August 16, 2021, but he postponed the procedure until October due to the termination of his employment and resulting loss of health insurance coverage. (Doc. 25-1, pp. 17, 19, tpp. 61, 67–68).

In 2015, Mr. Dyson was approved for FMLA leave to attend regular MRI scans related to his pituitary tumor and hypothyroidism. (Doc. 25-1, p. 34, tpp. 126–27). He also received intermittent FMLA leave totaling a few days for treatment of osteoarthritis in his left knee. (Doc. 25-1, p. 34, tpp. 127–28). In February 2019, Mr. Dyson received FMLA leave for his first hip replacement procedure, and he missed approximately four weeks of work. (Doc. 25-1, p. 34, tp. 129). Before the procedure, the plant's human resources department asked Mr. Dyson to complete FMLA paperwork. (Doc. 25-1, p. 33, tp. 125). When Mr. Dyson returned from FMLA leave, Mr. Courtney temporarily assigned him to the front office for a couple of weeks, citing concerns about the risk of falling in the manufacturing area. (Doc. 25-1, p. 35, tp. 131). Mr. Dyson received FMLA leave in December 2019 in connection with his back surgery, and he missed four or five weeks of work. (Doc. 25-1, pp. 35–36, tpp. 133–35).

In July 2020, Mr. Dyson received FMLA leave for his second hip replacement; he was absent from work for two or three weeks. (Doc. 25-1, p. 36, tpp. 136–37). When he returned to work, Mr. Dyson again worked in the front office for one week for safety reasons. (Doc. 25-1, p. 36, tp. 137). Two weeks before his termination,

Mr. Dyson submitted FMLA paperwork for his upcoming knee replacement surgery. (Doc. 25-1, p. 37, tp. 138).   Mr. Dyson had discussed the procedure with Mr. Courtney and Mr. Teixeira.   (Doc. 25-1, p. 37, tp. 139).   One week before his termination, Mr. Dyson notified Ms. Dabbs about his upcoming operation.   (Doc. 25-1, p. 43, tp. 165).   Mr. Dyson stated:

> I get terminated ten days before my surgery.   I have no disciplinary actions against me.   I have constantly had good raises for -- so I have been doing a good job.   I was asked to come to Matsu Alabama to help. My performance at Matsu Alabama had been very, very good.   Based on the number of quality concerns when I walked into Matsu Alabama was well over 200 a year, and I reduced that down to-- before I got terminated, I think we had had 20 that year, or 25.   I'm not sure which, compared to over 200 previously.

(Doc. 25-1, p. 47, tp. 181).

Mr. Dyson recalls that during production meetings, there were discussions about employees taking FMLA leave and the resulting employee absences.   (Doc. 25-1, p. 37, tp. 139).   Mr. Courtney was aware that Mr. Dyson had hip and knee issues.   (Doc. 25-9, p. 15, tp. 53).   Mr. Dyson also had conversations with Markus Zanker, Matsu Automotive's President, and Daniel Tiberini, Matsu's CEO, about his medical conditions.   (Doc. 25-1, p. 40, tp. 152).   After returning from medical leave, Mr. Zanker asked Mr. Dyson "if [he] was back healthy and working again," and Mr. Tiberini "would say the same, 'glad you are back' most of the time."   (Doc. 25-1, pp. 40–41, tpp. 152–54).   On one occasion, Mr. Tiberini stated: "Before long, you will be the Bionic Man."   (Doc. 25-1, p. 40, tp. 153) (internal quotation marks

7

omitted).  Mr. Courtney believes Matsu employees were aware of Mr. Dyson's surgeries because Mr. Dyson returned to work using a cane.  (Doc. 25-9, p. 21, tp. 76).

Matsu had "a self-funded health plan [] administered by Blue Cross Blue Shield."  (Doc. 25-6, p. 2, ¶ 4a).  In February or March of 2020, Jason Bleoo, the general manager of Matsu's Ohio plant, told Mr. Dyson about a discussion concerning Mr. Dyson's medical costs.  (Doc. 25-1, p. 41, tpp. 155–57).  Mr. Bleoo "said that on more than one occasion," Mr. Dyson's "name had been discussed with regards to the cost of [his] medical -- the cost of [his] surgeries to the company."  (Doc. 25-1, p. 41, tpp. 156–57).  Mr. Bleoo stated that Mr. Tiberini and Mr. Zanker "had discussed" Mr. Dyson's healthcare costs "and they said in the meeting that [Matsu was] going to have to do something about" it.  (Doc. 25-1, p. 41, tp. 157).  Mr. Courtney recalled that, during monthly financial meetings, Matsu leadership would discuss "a big insurance hit;" "if somebody had a baby or something like that."  (Doc. 25-9, p. 14, tpp. 46–48).

One month after his termination, a former Matsu employee, Edgar Gravitt, told Mr. Dyson that, during a discussion between Mr. Gravitt, Mr. Courtney, Mr. Zanker, and Mr. Tiberini, Mr. Zanker or Mr. Tiberini stated that the company "need[ed] to fire Dyson before he dies."  (Doc. 25-1, p. 42, tpp. 160–61) (internal quotation marks omitted).  According to Mr. Gravitt, Mr. Tiberini asked: "Do you

8

know how much money" Mr. Dyson "cost" Matsu "in medical?" (Doc. 34-2, p. 54, tp. 207–208). Mr. Zanker, Mr. Tiberini, and Mr. Courtney agreed that Mr. Dyson's healthcare cost an "outrageous" amount. (Doc. 34-2, p. 54, tpp. 208). Mr. Tiberini also stated that Matsu "need[ed] to get rid of Steve [Dyson] because he's got another surgery coming up." (Doc. 25-9, p. 21, tp. 74).

### III.

### ADA Discrimination Claim

"The ADA bars employers from 'discriminat[ing] against a qualified individual on the basis of disability.'" *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (brackets in *Alfa*) (quoting and citing 42 U.S.C. § 12112(a)). The ADA "impos[es] a 'but-for' causation standard—that is, an adverse employment action would not have occurred but for the plaintiff's disability." *Akridge*, 93 F.4th at 1192 (citations omitted). "[T]here can be multiple but-for causes of an adverse employment action." *Akridge*, 93 F.4th at 1200 (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)). A "defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Bostock*, 590 U.S. at 656 (italics in *Bostock*). "So long as the plaintiff's [disability] was one but-for cause of that decision, that is enough to trigger the law." *See Bostock*, 590 U.S. at 656 (citation omitted) (discussing standard in Title VII sex discrimination case).[2]

---

[2] In *Bostock*, the Supreme Court explained, in the context of sex discrimination:

Though parties and courts in ADA cases often assume that a plaintiff has a disability cognizable under the ADA, *see, e.g.*, *Akridge*, 93 F.4th at 1191–92, Matsu argues that Mr. Dyson does not, (Doc. 26, pp. 21–23). The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The "relevant time period for assessing the existence of a disability, so as to trigger the ADA's protections, is the time of the alleged discriminatory act." *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) (citations omitted). The "definition of disability in [the ADA] shall be construed in

---

An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. . . . If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.

590 U.S. at 659–60. Therefore, under the ADA, which employs the same but-for causation standard, "[a]n employer violates [the ADA] when it intentionally fires an individual employee based in part on" disability. *See Bostock*, 590 U.S. at 659.

10

favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). The "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Lewis v. City of Union City*, 934 F.3d 1169, 1180 (11th Cir. 2019) (quotation and citation omitted). The EEOC defines "substantially limits" "broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(i). For instance, the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" like "medication." 42 U.S.C. § 12102(4)(E)(i)(I). An "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(vii).

Mr. Dyson asserts that complications from his pituitary tumor and osteoarthritis substantially limit his major life activities. (*See* Doc. 36, pp. 20–22) (citing Doc. 34-1). In a declaration submitted with his response to Matsu's summary judgment motion, Mr. Dyson states that, without treatment, his pituitary tumor would cause "memory loss, blurred vision, and potential collapse." (Doc. 34-1, p. 2, ¶ 2). Mr. Dyson states that he has trouble bending over, that he "can only stand for limited periods of time," that he has "ongoing soreness" in his hips, knee, and back, and that, following his knee surgery, he cannot "kneel or exert pressure on [his] knee." (Doc. 34-1, pp. 2–3, ¶¶ 3–6). Though Mr. Dyson blurs the line between

11

difficulties he had before and after his termination, Mr. Courtney knew before Mr. Dyson's termination that Mr. Dyson "had knee and hip issues." (Doc. 25-9, p. 15, tp. 53). Without medication, Mr. Dyson's pituitary tumor would limit his "seeing" and "thinking," and at a minimum, his osteoarthritis limits his "standing." *See* 42 U.S.C. § 12102(2)(A). Under the ADA's broad definition of disability, Mr. Dyson's conditions qualify as disabilities.[3]

---

[3] Matsu argues that the Court may not rely on Mr. Dyson's declaration because it contradicts his deposition testimony. (Doc. 41, pp. 3–6). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Malone v. U.S. Att'y Gen.*, 858 Fed. Appx. 296, 300 (11th Cir. 2021) (internal quotation marks omitted) (quoting *Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). The Eleventh Circuit has cautioned that courts should "sparingly" strike affidavits as shams. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (internal quotation marks and quotation omitted). District courts should not strike declarations at the summary judgment stage where the court can "harmonize[]" the declaration with deposition testimony. *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986). A jury must make weight and credibility determinations about any hard-to-reconcile and potentially contradictory testimonies. *See Lane*, 782 F.2d at 1533.

In his deposition, Mr. Dyson stated that he has a pituitary tumor, hypothyroidism, and has had two hip replacements, a knee replacement, and back surgery. (Doc. 25-1, p. 15, tpp. 51–53). He testified that his pituitary tumor and his hypothyroidism do not limit his "physical activities," that his surgeries limited his "daily activities" "for a short period of time," and that he does not have other medical conditions that limit his "activities." (Doc. 25-1, pp. 16–17, tpp. 56–60). As discussed in this opinion, the ADA has defined "major life activities" as a legal term of art. 42 U.S.C. § 12102(2)(A). Matsu did not explain the contours of "major life activities" when questioning Mr. Dyson; it used the term "activities" in a general sense. Nor did Matsu question Mr. Dyson about the underlying cause of his hip, knee, and back issues. And Matsu did not ask Mr. Dyson if his pituitary tumor and his hypothyroidism would limit his activities without medication. Mr. Dyson's assertions in his declaration do not facially contradict his deposition testimony in response to general questions about his "activities" and surgeries. A lay person may not associate the general term "activities" with the ADA's definition of a major life activity. *See* 42 U.S.C. § 12102(2)(A). The jury may consider Mr. Dyson's declaration and testimony and assign credibility and weight.

To survive an employer's summary judgment motion concerning an ADA discrimination claim, a plaintiff may offer direct evidence of discrimination, proceed under the *McDonnell Douglas* burden-shifting framework, or present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *See Akridge*, 93 F.4th at 1191, 1197 (internal quotation marks, citations, and quotation omitted).[4] "'Direct evidence is evidence, that, if believed, proves [the] existence of [discriminatory intent] without inference or presumption.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (brackets in

Matsu also contends that Mr. Dyson cannot rely on his pituitary tumor and other medical conditions to support his ADA claims because he did not mention these conditions in his Equal Employment Opportunity Commission Charge of Discrimination. (Doc. 41, pp. 5–6). "[T]he scope of an EEOC complaint should not be strictly interpreted." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (internal quotation marks and quotation omitted). "[T]he 'proper' inquiry is whether the '[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge.'" *Batson*, 897 F.3d at 1328 (brackets added and in *Batson*) (quotation omitted). In his EEOC charge, Mr. Dyson states that he "was terminated because of" his "relatively high medical costs." (Doc. 25-2, p. 109). In his complaint, Mr. Dyson alleged that he "suffers from several medical conditions." (Doc. 1, p. 4, ¶ 21; *see also* Doc. 33, p. 4, ¶ 21). Mr. Dyson's deposition and declaration add color to this allegation. And when a plaintiff alleges in their EEOC charge that an employer terminated them because of their medical costs, one would expect that investigation of the charge would flesh out the employee's medical conditions. Therefore, Mr. Dyson may rely on the medical conditions he describes in his deposition and in his declaration.

[4] The Eleventh Circuit recently analyzed the differences between the *McDonnell Douglas* framework and the "convincing mosaic of circumstantial evidence" test, reaffirming its previous holdings that a plaintiff can survive summary judgment with a showing under either. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943-47 (11th Cir. 2023) (citations omitted). In its discussion, the Eleventh Circuit noted that, even though a "failure in the [*McDonnell Douglas* framework] often also reflects a failure of the overall evidence," parties and courts can "wrongly treat the [*McDonnell Douglas* framework] as a substantive standard of liability." *See Tynes*, 88 F.4th at 943-47; *see also Tynes*, 88 F.4th at 949-958 (Newsom, J., concurring) (emphasizing "the overreading of—and consequent overemphasis on—*McDonnell Douglas* . . . at the Rule 56 stage, where courts have increasingly taken to treating the test's prima-facie-evidence benchmark 'as a substitute standard necessary to survive summary judgment'" (citations and quotation omitted)).

13

*Jefferson*) (quotation omitted).  In *Jefferson*, a plaintiff presented direct evidence of race discrimination with testimony that a manager told the plaintiff that the manager could not offer the plaintiff a position because the manager's superior wanted an individual of a different race in the position.  *Jefferson*, 891 F.3d at 922.

The parties do not suggest that Mr. Dyson has presented direct evidence of discrimination.  Though Mr. Courtney recalled Mr. Tiberini saying that Matsu "need[ed] to get rid of Steve because he's got another surgery coming up," the record does not indicate that Mr. Tiberini participated in the decision to terminate Mr. Dyson.  *See Jefferson*, 891 F.3d at 922.  Here, because a factfinder must infer that Mr. Teixeira based his decision to terminate Mr. Dyson on Mr. Tiberini's statements, Mr. Tiberini's statements do not constitute direct evidence of discrimination.

Still, Mr. Tiberini's statements qualify as powerful circumstantial evidence of discrimination.  A "plaintiff will always survive summary judgment if [they] present[] . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination."  *Akridge*, 93 F.4th at 1197 (internal quotation marks omitted and quotation omitted).  "A plaintiff proving [their] case through the convincing mosaic standard may point to any relevant and admissible evidence. . . . 'no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff.'"  *Tynes*, 88 F.4th at 946 n.2. (citation omitted).  "Evidence that is likely to be probative is 'evidence that

14

demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext.'" *Tynes*, 88 F.4th at 946 n.2 (quotation omitted); *see also Akridge*, 93 F.4th at 1198 (citation omitted) (articulating similar standard).

A plaintiff demonstrates pretext by "point[ing] to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the justification" an employer gives for an employment action like a termination. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1308 (11th Cir. 2023) (quotation omitted). Here, viewing the evidence in the light most favorable to Mr. Dyson, a factfinder could infer that Mr. Tiberini, Matsu's CEO, wanted Mr. Dyson removed because Mr. Dyson's healthcare expenses were substantial and that management understood Mr. Tiberini's wishes. The conversation involving Mr. Gravitt, Mr. Courtney, Mr. Zanker, and Mr. Tiberini suggests that Matsu's leadership was aware of employees' medical expenses and knew that Mr. Dyson's healthcare cost the company an "outrageous" amount. (Doc. 34-2, p. 54, tp. 208). Other evidence in the record supports this inference. For instance, on at least one occasion, Mr. Tiberini and Mr. Zanker discussed Mr. Dyson's healthcare costs in a leadership meeting and indicated that Matsu needed "to do something about" it. (Doc. 25-1, p. 41, tpp. 155–57). Matsu's leadership also discussed "big insurance hit[s]" in

15

meetings.  (Doc. 25-9, p. 14, tpp. 46–48).  Based on this evidence, a reasonable factfinder could conclude that Mr. Teixeira knew of Mr. Dyson's significant medical expenses.

Though Mr. Dyson's termination letter cited "poor performance or discipline" as the reason for his dismissal, his personnel file does not include information that suggests that he had a history (or even a single instance) of discipline.  (Doc. 25-1, p. 43, tpp. 163–64).  Though Mr. Dyson may not have completed every task Mr. Teixeira assigned, (*see, e.g.*, Doc. 25-1, p. 39, tp. 148), Matsu did not discipline Mr. Dyson.  (Doc. 25-1, p. 30, tpp. 110–11).  Mr. Courtney gave Mr. Dyson "Good" performance evaluations.  (Doc. 25-1, p. 30, tpp. 110–11).  Mr. Dyson's termination "was a shock to" Mr. Courtney.  (Doc. 25-1, p. 45, tp. 173).  Ms. Dabbs told Mr. Dyson something to the effect of, "[i]t was not because of disciplinary action that you were let go."  (Doc. 25-1, p. 43, tpp. 163–64).  According to Mr. Dyson, under his supervision, the number of customer quality concerns decreased significantly, from 200 annually to no more than 25 per year.  (Doc. 25-1, p. 47, tp. 181).

These pieces of evidence, woven together, reasonably could lead a factfinder to conclude that Matsu's proffered reason for Mr. Dyson's termination was not the real reason.  A reasonable factfinder could infer that Matsu cited Mr. Dyson's performance as a pretext to terminate him because his healthcare cost the company a great deal.  *See Berry*, 84 F.4th at 1308 (citation omitted).

16

As for suspicious timing, in *Akridge*, the employer "continued to employ [the plaintiff] for decades, funding the cost of her healthcare for decades too." *Akridge*, 93 F.4th at 1198. The Eleventh Circuit concluded that "the timing of relevant events in this case [wa]s anything but suspicious." *Akridge*, 93 F.4th at 1198. As in *Akridge*, Matsu had employed Mr. Dyson and paid his healthcare costs for years. Still, Matsu terminated Mr. Dyson ten days before his scheduled knee surgery, one week after he notified Ms. Dabbs and Mr. Courtney about the operation, and two weeks after he submitted FMLA paperwork concerning the procedure. (Doc. 25-1, pp. 27, 43, 47, tpp. 138, 165, 181). The "close temporal proximity between" Mr. Dyson's upcoming surgery and his notification to Matsu about the operation, a period of "no more than two weeks," allows a factfinder to infer intentional discrimination. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (citation omitted). When considered with Mr. Dyson's evidence of pretext, a reasonable factfinder could conclude that Matsu discriminated against Mr. Dyson because of the cost of his healthcare.

In sum, Matsu is not entitled to summary judgment on Mr. Dyson's ADA discrimination because the evidence, viewed in the light most favorable to Mr. Dyson, creates a genuine dispute of material fact as to whether his disability and the healthcare costs associated with the disability was a but for cause of his termination.

17

**ADA Retaliation Claim**

Mr. Dyson asserts that Matsu retaliated against him by terminating him after he sought reasonable accommodation, in the form of leave, to undergo his knee surgery. (Doc. 36, p. 28). Matsu argues that Mr. Dyson did not exhaust his administrative remedies before asserting his retaliation claim under the ADA. (Doc. 26, pp. 25–26).

"[U]nder the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII." *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) (citing 42 U.S.C. § 12117(a)). That means that ADA plaintiffs must file a charge of discrimination or retaliation with the EEOC and receive a right to sue letter before plaintiffs may file a federal lawsuit against their employers. "[T]he scope of an EEOC complaint should not be strictly interpreted." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (internal quotation marks and quotation omitted). "[T]he 'proper' inquiry is whether the '[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge.'" *Batson*, 897 F.3d at 1328 (brackets added and in *Batson*) (quotation omitted).

For example, in *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336 (11th Cir. 2022), the Eleventh Circuit concluded that:

> It may be fair to say that Patterson's EEOC charge largely focuses on race discrimination, but it would be unfair to say that's all it discusses

and alleges.  It also discusses how Patterson gave deposition testimony in a "federal Title VII pregnancy discrimination case filed against [her] former employer." And it recounts how [Human resources] questioned her about that deposition, asked her why she "had testified against the company [she] used to work for," and stated that her giving the deposition "'made things clear' to [them]." . . . [T]hat is enough to bring within the scope of Patterson's EEOC charge the claim that she was fired in retaliation for giving the [] deposition.

*Patterson*, 38 F.4th at 1345 (quotations and citations omitted).  In other words, because the plaintiff "stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation because of her giving the [] deposition," she "exhausted her EEOC remedies."  *Patterson*, 38 F.4th at 1345-46 (quotation omitted).

In his EEOC charge, Mr. Dyson stated:

Since the commencement of my employment with Matsu Alabama, Inc. I had undergone several surgeries.  Specifically, I had each hip replaced (in 2019 & 2020 respectively) and had back surgery in 2020[.]  I was also scheduled to have knee surgery on August 16th, 2021.

In or around early 2021, the President of the company, Marcus Zanker, was overheard in a meeting discussing terminating employees who had high medical costs because of their health, as a cost-cutting measure. In the six (6) months prior to my termination, two (2) other managers, both in their mid-50s, were terminated on false premises, due to their age and the cost of their medical care.

On August 6th, 2021, I was summarily terminated.

(Doc. 25-2, p. 109).  As in *Patterson*, though Mr. Dyson's EEOC Charge focuses on his ADA discrimination claim, Mr. Dyson "stated facts from which a reasonable EEOC investigator could have concluded that what [he] had complained about is

19

retaliation because of" his request for leave to undergo knee surgery. *See Patterson*, 38 F.4th at 1345–46 (internal quotation marks and quotation omitted).

The *McDonnell Douglas* framework and the "convincing mosaic of circumstantial evidence" test also govern the resolution of Mr. Dyson's retaliation claim. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) (indicating *McDonnell Douglas* framework applies to ADA retaliation claims); *Berry*, 84 F.4th at 1311–12 (indicating courts can also analyze Title VII retaliation claims under the convincing mosaic standard); *McCormick v. Se. Pers. Leasing, Inc.*, No. 22-10466, 2022 WL 4462172, at *2 (11th Cir. Sept. 26, 2022) (analyzing ADA retaliation claim under both *McDonnell Douglas* and convincing mosaic frameworks).

Mr. Dyson has presented a convincing mosaic of circumstantial evidence from which a reasonable jury could infer that Matsu terminated him in retaliation for requesting medical leave for knee surgery. Mr. Dyson was fired ten days before the scheduled procedure and shortly after submitting FMLA paperwork and informing company leadership, including Mr. Courtney, Mr. Teixeira, and Ms. Dabbs, of the surgery. (Doc. 25-1, p. 17, tp. 61; Doc. 25-1, p. 37, tp. 138; Doc. 25-1, p. 37, tp. 139; Doc. 25-1, p. 43, tp. 165). When Mr. Teixeira fired Mr. Dyson, Mr. Dyson had no disciplinary history, and Ms. Dabbs insinuated that "it was not because of

disciplinary action that you were let go." (Doc. 25-1, p. 43, tp. 63; Doc. 25-1, p. 43, tp. 164).

Mr. Bleoo, Matsu's Ohio plant general manager, told Mr. Dyson that his (Mr. Dyson's) name had been discussed by executives in relation to the cost of his medical care and that the company was "going to have to do something about" it. (Doc. 25-1, p. 41, tpp. 155–57). A coworker, Mr. Gravitt, told Mr. Dyson that Mr. Tiberini asked, "Do you know how much money [Mr. Dyson] cost [Matsu] in medical?" (Doc. 25-1, p. 42, tpp. 160–61; Doc. 34-2, p. 54, tp. 207–208). Mr. Gravitt indicated that Mr. Zanker, Mr. Tiberini, and Mr. Courtney found Mr. Dyson's healthcare costs "outrageous." (Doc. 34-2, p. 54, tpp. 208–09). Mr. Tiberini further remarked that the company needed to "get rid of Steve because he's got another surgery coming up" (Doc. 25-9, p. 21, tp. 74). Because Matsu operated a self-funded health plan, the company directly bore the financial burden of employee medical expenses. (Doc. 25-6, p. 2, ¶ 4a).

Together, the close temporal proximity between Mr. Dyson's request for leave and his termination, his clear performance record, and repeated leadership remarks concerning the financial impact of Mr. Dyson's healthcare expenses and anticipated surgery create a disputed issue of fact as to whether Matsu's stated reason for terminating Mr. Dyson was pretextual. A reasonable jury could conclude that Mr. Dyson's request for medical leave for his anticipated knee surgery was a substantial

21

motivating factor in Matsu's decision to terminate his employment. Because Mr. Dyson has sufficiently exhausted his EEOC remedy for his ADA retaliation claim and has presented a combination of circumstantial evidence to support his ADA retaliation claim, the Court denies Matsu's motion for summary judgment on this claim.

**FMLA Interference Claim**

The FMLA enables employees to request up to twelve weeks of unpaid leave per year to address "serious health conditions." 29 U.S.C. § 2612(a)(1)(D). The FMLA also prohibits an employer from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" an employee's right to leave. 29 U.S.C. § 2615(a)(1). This protection extends to "an employee who gives '[n]otice of an intent to use FMLA leave in the future.'" *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1276 (11th Cir. 2020) (brackets in *Munoz*) (quotation omitted).

To establish an FMLA interference claim, a plaintiff "must show only that he was 'denied a benefit to which [he] was entitled under the FMLA.'" *McAlpin v. Sneads*, 61 F.4th 916, 933 (11th Cir. 2023) (quotation omitted). A plaintiff must establish entitlement to a benefit, denial of that benefit, and "harm from the alleged interference" redressable "by either damages or equitable relief." *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021) (internal quotation marks, quotation, and citations omitted). To satisfy the requirement that the plaintiff

22

was entitled to an FMLA benefit, the plaintiff "must demonstrate that []he sought leave for a qualifying reason and that []he provided notice meeting certain criteria." *Ramji*, 992 F.3d at 1242.

Matsu contends that Mr. Dyson's interference claim fails because he did not "follow Matsu's procedures regarding certification of [his knee surgery]," and therefore was not entitled to a benefit under the FMLA. (Doc. 43, p. 18). Matsu asserts that "even if [Mr. Dyson] could show that he was entitled to FMLA leave, Matsu is still entitled to summary judgment because it would have terminated [Mr. Dyson]'s employment based on performance regardless of his alleged request for FMLA leave." (Doc. 43, p. 19). Finally, Matsu argues that the decision to terminate Mr. Dyson's employment does not constitute FMLA interference because Mr. Teixeira was not aware of Mr. Dyson's "need for FMLA leave when he made the decision to terminate [Mr. Dyson]'s employment." (Doc. 43, p. 19).

In examining notice with respect to FMLA leave, a district court "asks whether the 'employee adequately conveyed to the employer sufficient information to put the employer on notice that h[is] absence was potentially FMLA-qualifying." *Ramji*, 992 F.3d at 1242. "[A]n employee's notice must be timely and contain sufficient information—requirements that differ, depending on whether the employee's need for leave is foreseeable or unforeseeable." *Ramji*, 992 F.3d at 1243 (citation omitted). "[P]lanned medical treatment for a serious health condition of

23

the employee," like a surgery, constitutes a foreseeable need for leave. *See* 29 C.F.R. § 825.302(a).

Per FMLA regulations, an employee must provide either "at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable." 29 C.F.R. § 825.302(a)-(b). Under FMLA regulations, an employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c).

Here, viewing the evidence in the light most favorable to Mr. Dyson, Mr. Dyson informed his supervisors, including Mr. Courtney and Mr. Teixeira, that he had knee replacement surgery scheduled for August 16, 2021, and he submitted FMLA paperwork regarding the surgery. (Doc. 25-1, pp. 37, 43, tpp. 138–39, 165). This suffices as adequate notice of FMLA leave.

The evidence demonstrates that Matsu denied Mr. Dyson an FMLA benefit to which he was entitled. For his knee replacement surgery, Mr. Dyson followed the process he had followed to request FMLA leave for earlier surgeries. (Doc. 25-1, pp. 33–37, tpp. 125–138), but ten days before the surgery was scheduled, Matsu abruptly terminated him without warning. (Doc. 25-1, p. 45, tp. 172; Doc. 25-1, p. 43, tpp. 163–64).

24

The record undermines Matsu's argument that the company would have terminated Mr. Dyson based on performance regardless of his leave request. As discussed, Mr. Dyson had no disciplinary history, received "Good" performance reviews from Mr. Courtney, and reduced quality concerns from over 200 per year to around 20–25. (Doc. 25-1, p. 30, tpp. 110–11; Doc. 25-1, p. 47, tp. 181). Ms. Dabbs confirmed that Dyson's file showed no discipline and that his termination was not due to any formal performance issues. (Doc. 25-1, p. 43, tp. 163–64). This evidence supports a reasonable inference that Matsu's decision was not based on performance but instead was motivated by Mr. Dyson's request for another period of FMLA leave.

Therefore, the Court denies Matsu's motion for summary judgment on Mr. Dyson's FMLA interference claim.

## FMLA Retaliation

The FMLA prohibits employers from retaliating against employees for opposing a practice the FMLA makes unlawful. 29 U.S.C. § 2615(a)(2). An employee pursuing an FMLA "retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland v. Water Works and Sewer Bd. of Birmingham,* 239 F.3d 1199, 1207 (11th Cir. 2001) (internal quotation marks omitted). Absent direct evidence of retaliatory intent, the plaintiff must show that he engaged in activity the FMLA protects,

25

he experienced an adverse employment action, and the action was causally related to the protected activity. *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008). "Once the employee establishes a prima facie case of retaliation, the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" *Martin*, 543 F.3d at 1268 (quoting *Hurlbert*, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Martin*, 543 F.3d at 1268 (citation omitted).

Here, Mr. Dyson has presented sufficient evidence to establish a genuine dispute of material fact regarding the connection between his request for FMLA leave and his termination. For example, contrary to Matsu's assertion that Mr. Teixeira was unaware of Mr. Dyson's FMLA request, Mr. Dyson testified that he discussed his planned knee surgery with Mr. Teixeira and Mr. Courtney two weeks before Mr. Teixeira terminated him. (Doc. 25-1, p. 37, tp. 139). This testimony supports an inference of retaliatory intent. The ten-day gap between Mr. Dyson's FMLA request and his termination also supports a finding of retaliatory intent and causation. *See Martin*, 543 F.3d at 1268.

The evidence discussed at length in this opinion permits a reasonable inference that Mr. Dyson's anticipated FMLA leave played a role in the decision to

26

terminate him, and Matsu's stated reasons for Mr. Dyson's termination cannot be reconciled with his personnel file. Accordingly, Mr. Dyson's FMLA retaliation claim will proceed to trial.

## IV.

For the reasons discussed, the Court denies Matsu's motion for summary judgment and motion to strike.[5]

The Clerk of Court shall please TERM Docs. 24 and 41.

**DONE** and **ORDERED** this March 20, 2026.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[5] Because the Court has not relied on evidence addressed in Matsu's motion to strike, Matsu's motion is moot.

27